IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| TRUSTMARK NATIONAL BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:22-cv-00649 |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| REDBIRD INVESTMENTS, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Pending before the Court is Plaintiff's motion for summary judgment (Doc. No. 51 "Plaintiff's Motion") wherein Plaintiff seeks summary judgment in its favor against Defendants Redbird Investments, LLC ("Redbird") and Dennis Lindley ("Lindley") (collectively, "Defendants"). Plaintiff filed a memorandum in support of the Motion (Doc. No. 53, "Plaintiff's Memorandum"). Defendants then filed a response in opposition (Doc. No. 63, "Response to Plaintiff's Motion"), to which Plaintiff filed a reply (Doc. No. 73, "Plaintiff's Reply").

Also pending before the Court is Lindley's "Motion to Dismiss or for Summary Judgment" (Doc. No. 54, "Lindley's Motion") (collectively with Plaintiff's Motion, "Motions"), wherein Lindley moves to dismiss all claims against him pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, to enter summary judgment in his favor as to all claims against him. Lindley filed a memorandum in support of the Motion (Doc. No. 55, "Lindley's Memorandum"). Plaintiff then filed a response in opposition (Doc. No. 70, "Response to Lindley's Motion"), to which Lindley filed a reply (Doc. No. 75, "Lindley's Reply").

For the reasons stated herein, Plaintiff's Motion will be granted in part and denied in part, and Lindley's Motion will be denied.

In 2020, Redbird, a limited liability company owned by Lindley and his business partner, Nathaniel Sparks ("Sparks"), sought financing from Trustmark Bank ("Plaintiff") to buy a lot and build a spec house. (Doc. No. 64 at 1). Redbird obtained a line of credit loan ("LOC") from Plaintiff on July 16, 2021 for advances up to $501,768.73 for purposes of building the spec house. (Doc. No. 64 at 1). On July 16, 2021, Lindley traveled to a branch of Plaintiff's financial institution in Mississippi to establish the LOC. There, he signed a beneficial-ownership statement stating that he was the controlling party and 100% beneficial owner of Redbird.[2] (Doc. No. 64 at 2).

At the branch, Redbird (via Lindley) executed a promissory note (Doc. No. 1-1, "Redbird Note") wherein Redbird promised to repay to Defendant Redbird's "indebtedness" as defined in

---

[1] The facts that are stated herein without qualification are undisputed—a term the Court will use to describe both facts that are not in dispute *at all* and facts that are not in *genuine* dispute—and are treated as such. Alleged facts that are qualified here in some way (as for example by being prefaced with "Defendants assert that") are in dispute and are treated as such. Some of the facts herein come from Defendants' "Response to [Plaintiff's] Statement of Facts" (Doc. No. 64), wherein they are not disputed by Defendants in response to Plaintiff's assertion of them, and "[Plaintiff's] Response to Statement of Facts in Support of Lindley's Motion to Dismiss or For Summary Judgment" (Doc. No. 71), wherein they are not disputed by Plaintiff in response to Lindley's assertion of them. Other facts come from "[Plaintiff]'s Response to Defendants' Statement of Additional Facts" (Doc. No. 72).

 Other facts contained herein come from record evidence (such as depositions) and are cited (as being accurate) by the opposing parties in their respective briefing. Other facts (background, uncontroversial ones) are mutually stated in the parties' opposing briefing.

 Moreover, as discussed elsewhere, the Court treats certain facts as undisputed because Plaintiff has cited only its own deposition testimony to deny those facts, and Plaintiff's deposition testimony does not adequately show that it has personal knowledge of the alleged information relied on to dispute those facts.

 There are other purported facts that are disputed but are evidentially supported and are asserted by Plaintiff and Defendants, respectively, to support their respective views that there is (according to Plaintiff) or is not (according to Defendants) a genuine issue of material fact as to a particular claim. The Court refers to these purported facts, and the evidence supporting them, in appropriate places in its analysis below.

[2] Defendants admit that Lindley signed the beneficial-ownership statement stating that he owned 100% of Redbird but deny that Lindley ever intentionally represented that he was 100% owner of Redbird. Plaintiff accepts as true, for purposes of the instant Motion, that Lindley never represented (intentionally or otherwise) he was 100% owner of Redbird.

the Redbird Note. (Doc. No. 64 at 2). The Redbird Note was secured by a deed of trust on the lot on which Redbird planned to build the spec house. (Doc. No. 1-2).

Also while in Mississippi on July 16, 2021 (the same day that Redbird obtained the LOC and opened the Redbird Account), Lindley signed a guarantee agreement (the "Guarantee"). (Doc. No. 1-6). The Guarantee stated that Lindley personally "absolutely and unconditionally guarantees the payment and satisfaction of the Indebtedness of [Redbird] to [Plaintiff], and the performance and discharge of all [of Redbird's] obligations under the [Redbird] Note and Related Documents." (Doc. No. 1-6 at 1). "Related Documents" is defined in the Guarantee as "all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness." (*Id*. at 2). "Indebtedness" is defined as: "all of the principal amount outstanding from time to time and at any times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations that [Redbird] individually or collectively or interchangeably with others, owes or will of the Note and Related Documents and any renewals, extensions, modifications, refinancings, consolidations and substitutions of the Note and Related Documents." (*Id*. at 1).

Angela Kinder ("Kinder"), an operation specialist for Plaintiff, handled the opening of the LOC and signing of the Guarantee. (Doc. No. 71 at 2). However, Kinder is not involved in the opening of new checking accounts. (*Id*.). So after Lindley signed the LOC documents (Redbird Note and Guarantee), Kinder excused herself, and another employee of Plaintiff, Catherine Collins, handled the opening of a demand deposit account ("Redbird Account") for Redbird. (Doc.

No. 71 at 1-2). Lindley, the only authorized signer on the Redbird Account, acknowledged that the Redbird Account was opened for the express purpose of receiving deposits of future draws on the Redbird LOC.[3] (Doc. No. 1-3). All advances from the LOC were deposited into the Redbird Account, at Redbird's request. (Doc. No. 64 at 5).

The Redbird Account is governed by the Account Agreement (Doc. No. 1-4, "Account Agreement"). Under the Account Agreement, Redbird was "responsible for having sufficient funds in [its] account to pay all Items."[4] (Doc. No. 1-4 at 11). The Account Agreement provides the following regarding Redbird's obligations with respect to "bad" checks (i.e., checks deposited into the Redbird Account but subsequently returned unpaid by the drawee bank):

> If any item you deposit to your account or you cash is returned unpaid, we have the right to debit your account for the amount of such item…even if the debit …results in…overdrafts…. You will, in any event, be liable to us for the amount of any item you deposit to your account or receive cash that is returned unpaid, plus our costs and expenses associated with collection of all or any part of such amount from you, including reasonable attorneys' fees."

(Doc. No. 1-4 at 4). Additionally, the Account Agreement requires Redbird to repay Plaintiff when it overdraws the Redbird Account. (*Id*. at 14).[5]

---

[3] Defendants purport to dispute this fact but do not cite anything that actually serves to dispute it. The Court therefore accepts this fact as true for purposes of the Motions.

[4] As used herein, "items" refers to checks.

[5] Defendants argue that the Account Agreement requires Redbird to repay Plaintiff only for an overdraw that results from the payment of *authorized* items because (according to Defendants), "Items" as used in the Account Agreement means only authorized items. The Court rejects this interpretation of "Items" by Defendants because it lacks any support in the Account Agreement. The Account Agreement defines "Item" as "any check, draft, withdrawal, transfer or order for the payment of money, oral or written, in electronic or other form (including, but not limited to, transfer or withdrawal by ATM, debit card, ACH, wire, online banking, etc.)." (Doc. No. 1-4 at 2). Despite this clear definition, Defendants curiously rely on a separate provision of the Account Agreement to support their conclusion that "Items" actually refers only to authorized items. According to Defendants, that provision states: "If you [Redbird] do not return the executed Signature Card to us, you assume liability for any and all unauthorized transactions." (Doc. No. 64 at 6). However, that exact language never appears in the Account Agreement. The provision Defendants likely meant to cite instead states "If you [Redbird] do not give us a Signature Card signed by you and all

After Redbird opened the Redbird Account, Lindley (unbeknownst to Plaintiff) gave Sparks access to certain Redbird checks and authorized Sparks to sign them "Dennis Lindley." (Doc. No. 64 at 10). However, Lindley did not give Sparks general access to *all* Redbird checks or *generally* authorize him to sign Redbird checks using Lindley's name. (*Id.*). Sparks (although not a signatory on the Redbird Account) wrote several Redbird checks made payable to a Redbird business account that was in Lindley's name.[6] (*Id.*). The Redbird checks that Lindley did not authorize Sparks to write include the checks numbered 1052, 1053, 1058-1062, 1064-1066, or 1068-1073.[7] (*Id.*; Doc. No. 72 at 18).

Notably, Sparks (who is now deceased) became a customer (in his personal capacity) of Plaintiff in 2019. Plaintiff's corporate security team later determined that Sparks had potentially engaged in check kiting.[8] As a result of this suspicion, Plaintiff closed Sparks's accounts (before

owners and authorized signers, you assume all liability for any and all unauthorized transactions . . . ." (Doc. No. 1-4 at 7). Regardless, this statement does nothing to indicate that "Items" as used in the Account Agreement is limited to items (i.e., checks) that Redbird has authorized.

[6] The "Redbird business account that was in Lindley's name," refers to a checking account Lindley opened in his name at Home Banking Company "for the [sole] purpose of conducting business on behalf of Redbird." (Doc. No. 65-8 at ¶ 4). According to Lindley, although the Home Banking Company account was opened in Lindley's name, it was "treated as a [Redbird] account, and was used solely for [Redbird] business." (*Id.*).

[7] It is unclear from the record whether the checks numbered 1052, 1053, 1058-1062, 1064-1066, or 1068-1073 are the *only* unauthorized checks that gave rise to the total overdrawn amount of the Redbird Account. Although none of the parties expressly state that the overdrawn amount arose solely from those checks, their mutual focus on those checks gives the Court reason to believe that the payment of those checks alone does in fact account for the entire overdrawn amount. Moreover, Defendants do not dispute the total amount of the overdrawn funds ($455,724.17) claimed by Plaintiff.

[8] As The Sixth Circuit has explained:

> Check kiting is a systematic scheme to defraud, whereby nonsufficient checks are traded or cross deposited between two or more checking accounts in order to artificially inflate the bank account balances. This is accomplished by using the float time in the bank system. Once bank accounts are artificially inflated, checks that would normally be returned for nonsufficient funds are, in fact, paid or honored by the issuing banks.

Redbird sought financing from Plaintiff) and prohibited him from opening new accounts with the bank.

The loan officer responsible for opening the LOC for Redbird, Charles Alderman ("Alderman"), and Market President Charles Russell ("Russell") were aware of Sparks's history and prohibitions at the time the LOC was approved. Plaintiff also knew that Sparks was a half-owner of Redbird at the time Plaintiff approved a loan to Redbird and opened a deposit account for Redbird for which Lindley was the sole authorized signatory. (Doc. No. 73 at 2). Lindley was not aware of Sparks's prior issues (i.e., potential check kiting and closing of accounts) with Plaintiff.

Plaintiff mailed to Lindley (and Lindley received) monthly statements for the Redbird Account. (Doc. No. 64 at 11). Despite language in the Guarantee stating that Lindley agreed to "keep [himself] adequately informed . . . of any facts, events or circumstances which might in any way affect [Lindley's] risks under th[e] Guarantee," (Doc. No. 1-6 at 1), Lindley did not immediately open the monthly statements (or any other documents) mailed to him by Plaintiff. (Doc. No. 64 at 12).

Lindley also had online access to the Redbird Account. Through his online access, Lindley could see information about the Redbird Account including deposits, withdrawals, fees (including overdraft fees), whether it was overdrawn, as well as images of every check that's been paid. (Doc.

_United States v. Abboud_, 438 F.3d 554, 563 n. 1 (6th Cir. 2006).

No. 64 at 13).[9] Plaintiff's records show that Lindley logged into the Redbird Account online more than 70 times between July 2021 and December 2021. (Doc. No. 64 at 14).[10]

Redbird obtained eight advances under the LOC totaling $413,400.93, all of which were authorized by Lindley and deposited into the Redbird Account. (*Id*.). However, Redbird failed to use the majority of those funds for construction of the spec house. (*Id*.).[11] At the time of Sparks's death on December 18, 2021, the Redbird Account had been overdrawn in the amount of $455,724.17. (Doc. No. 64 at 14). The parties dispute why the Redbird Account was overdrawn. Defendants contend that the Redbird Account was overdrawn not because of any authorized action taken on behalf of Redbird, but because of Plaintiff's payment of unauthorized checks (which were drawn on the Redbird Account, written by Sparks, but signed "Lindley") for which there were insufficient funds.[12] (*Id*. at 14-15). Plaintiff does not dispute (for purposes of summary judgment)

---

[9] Defendants dispute whether Lindley's testimony actually supports this, but it clearly does. (Doc. No. 65-1 at 154-55).

[10] Lindley did not share his login credentials with anyone and admitted that any logins "should [have been] his."

[11] Defendants assert that the individual responsible for making this assertion (Robert Ruby) lacks personal knowledge to do so.

[12] Plaintiff asserts (and Defendants do not appear to dispute) that Sparks presented checks (signed by Sparks) from his accounts at other banks for *deposit into* the Redbird Account for which Plaintiff gave Redbird provisional credit in the Redbird Account. (Doc. No. 1 at ¶ 25; Doc. No. 72 at ¶ 34). The Court refers herein to these checks as "type 1 checks." The funds provisionally credited for those checks were then spent (at least in part, it appears) through checks ("type 2 checks") *drawn on* the Redbird Account by Sparks but signed "Lindley"). Some of the type 1 checks (i.e., checks *deposited into* the Redbird Account by Sparks) were later returned because they were drawn on insufficient funds, thus resulting in an overdraft of the Redbird Account (because the provisional, but thereafter reversed, credit given for those checks had been spent via the type 2 checks).

The parties do not dispute the existence or amount of the overdraft, nor do they dispute that the type 2 checks were not authorized by Lindley. (Doc. No. 72 at ¶ 45). Rather, the parties dispute who should bear the loss on the overdraft amount caused by Plaintiff's payment of the unauthorized type 2 checks, based on the Account Agreement and Mississippi law. According to Plaintiff, Defendants should be responsible for the overdraft amount for failing (according to Plaintiff) to report to unauthorized type 2 checks to Plaintiff as required (again, according to Plaintiff) by Mississippi law and the Account Agreement. Defendants disagree, asserting that Plaintiff should have foreseen, detected, and notified Defendants about the

that it paid checks (including checks numbered 1052, 1053, 1058-1062, 1064-1066, and 1068-1073) that were unauthorized (Doc. No. 72 at ¶ 45), but Plaintiff insists that it did not *know* the checks were unauthorized because Defendants did not report them as such to Plaintiff as (according to Plaintiff) Mississippi law and the Account Agreement required. Moreover, Plaintiff maintains that the Redbird Account was overdrawn at least in part because of a $120,000 withdrawal that Lindley authorized Sparks to make on his behalf. (*Id*. at 15 (citing Doc. No. 51-4 at 2)).

On January 26, 2022, Plaintiff demanded that Defendants pay the balance of the Redbird LOC, cure the overdraft amount in the Redbird Account, and pay all attorney's fees and expenses associated with enforcing and collecting the Indebtedness. (*Id*. at 17). Defendants paid the principal and interest due on the Redbird LOC, but declined to pay what Plaintiff considers to be the overdrawn amount and any associated attorney's fees and expenses. (*Id*.). However, after Plaintiff filed this lawsuit, Defendants paid the portion of attorney's fees and expenses that Plaintiff incurred in the collection of the balance of the Redbird LOC amount (but not the collection of what Plaintiff considers the overdrawn amount in the Redbird Account). (Doc. No. 64 at 18).

Plaintiff seeks judgment against Redbird and Lindley, individually, for the overdrawn amount of $455,724.17 plus pre-and-post-judgment interest, as well as reasonable attorney's fees and costs incurred in connection with the enforcement and collection of the overdrawn amount of the Redbird Account, which as of December 15, 2023, amounted to $163,141.36.[13] (Doc. No. 1 at

---

unauthorized transactions, and that Plaintiff should be responsible for the overdrawn amount for its failure to do so.

[13] Although the Complaint states that Plaintiff seeks to recover reasonably attorney's fees and costs incurred in connection with the enforcement and collection of the "Indebtedness at issue (resulting from *both* the Redbird LOC *and* the related overdrawn Redbird Account)," (Doc. No. 1 at ¶¶ 35, 38) (emphasis added), Plaintiff admitted in a subsequent filing that after Plaintiff filed this lawsuit, Defendants paid the portion of attorney's fees and expenses that Plaintiff incurred in the collection of the balance of the Redbird LOC amount. (*See* Doc. No. 64 at 18). Accordingly, the Court construes Plaintiff's demand for reasonable

7; Doc. No. 53 at 10). Specifically, in Count I, Plaintiff seeks judgment against Redbird for the overdrawn amount of the Redbird Account ($455,724.17) pursuant to the Account Agreement. (*Id.* at ¶ 34). In Count I, Plaintiff also seeks judgment against Redbird for reasonable attorney's fees and costs incurred in connection with collecting the overdrawn amount in the Redbird Account ($163,141.36, as of December 15, 2023), based on the Redbird Note, Redbird Deed of Trust (Doc. No. 1-2), and Account Agreement. (*Id.* at ¶ 35); (Doc. No. 53 at 10); (*See* Doc. Nos. 53 at 8; 64 at 18).

According to Plaintiff, by signing the Guarantee, Lindley became personally liable for any default (by Redbird) under the Account Agreement because the Account Agreement (according to Plaintiff) is a "Related Document" to the Redbird Note and LOC. Thus, in Count II, Plaintiff seeks judgment against Lindley, based on the Guarantee, for the overdrawn amount of the Redbird Account ($455,724.17) that Redbird allegedly owes Plaintiff. (*Id.* at ¶ 37). Additionally in Count II, Plaintiff seeks judgment against Lindley for reasonable attorney's fees and costs incurred in connection with collecting the overdrawn amount of the Redbird Account ($163,141.36, as of December 15, 2023). (*Id.* at ¶ 38); (Doc. No. 53 at 10); (*See* Doc. Nos. 53 at 8; 64 at 18).

Plaintiff has moved for summary judgment against both Defendants, relying on the terms of the Redbird Note, Account Agreement and Guarantee. Defendants oppose summary judgment in favor of Plaintiff, relying on Article 4 of Mississippi's Uniform Commercial Code. Defendants argue that Plaintiff should have foreseen, detected, and notified Redbird of these transactions when they occurred (or at least at some earlier time), and that Plaintiff's failure to do so prohibits Plaintiff from holding Defendants liable for Plaintiff's payment of the unauthorized items. Lindley has filed a cross-motion for summary judgment on the purported basis that the Guarantee does not apply to

---

attorney's fees and costs as being limited to those incurred in connection with the enforcement and collection of the overdrawn amount of the Redbird Account.

any deficit in the Redbird Account (and thus, according to Lindley, he cannot be held liable for the deficit in the Redbird Account).

<u>LEGAL STANDARD</u>

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 640 (6th Cir. 2006) (citing *Anderson*, 477 U.S. at 248), *abrogated on other grounds by Young v. Utd. Parcel Serv.*, 575 U.S. 206 (2015). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018). The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc*., 901 F.3d 619, 627–28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Alternatively, the moving party may meet its initial burden by otherwise "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support a material fact (for example, the existence of an element of a nonmovant plaintiff's claim)." Fed. R. Civ. P. 56(c)(1)(B). If the summary judgment movant meets its initial burden, then in response the non-

moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.[14] Importantly, "[s]ummary judgment for a defendant [that has met its initial burden as the movant] is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial.'" *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999) (quoting *Celotex*, 477 U.S. at 322).

Any party asserting that a fact cannot be or genuinely is disputed (*i.e.*, any party seeking summary judgment and any party opposing summary judgment, respectively) can support the assertion either by: (a) citing to materials in the record, including, but not limited to, depositions, documents, affidavits, or declarations, Fed. R. Civ. P. 56(c)(1)(A), or (b) "showing" (i) that the adverse party cannot produce admissible evidence to raise a genuine dispute as to that fact or (ii) that contrary to the claim of the adverse party, the materials cited by the adverse party do not actually establish the absence or presence (as the case may be) of a genuine dispute as to that fact.

In reviewing a motion for summary judgment, this Court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary

---

[14] Courts (appropriately) at times refer interchangeably to a party being able to raise a genuine issue as to a fact and a reasonable jury being able to find in the party's favor on that fact, and this Court does likewise.

judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792 at *5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *New Century Found. v. Robertson*, 400 F. Supp. 3d 684, 689 (M.D. Tenn. 2019) (citing *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009). "[S]ummary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). In addition, "if the moving party will bear the burden of persuasion at trial, then that party must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." *Timmer v. Mich. Dep't of Com.*, 104 F.3d 833, 843 (6th Cir. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)); *see also Ely v. Dearborn Heights Sch. Dist. No. 7*, 150 F. Supp. 3d 842, 849-50 (E.D. Mich. 2015) (explaining that if the moving party bears the burden of proof at trial that party "must satisfy both the initial burden of production on the summary judgment motion—by showing that no genuine dispute exists as to

any material fact—and the ultimate burden of persuasion on the claim—by showing that it would be entitled to a directed verdict at trial." (citing William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477–78 (1992))).

DISCUSSION

## I.      Overview of Analysis

After explaining the provisions of Mississippi's UCC relevant to this case, the Court will address Plaintiff's Motion to determine whether Plaintiff is entitled to summary judgment against Redbird (based on the Account Agreement) for the overdrawn amount of the Redbird Account. For the reasons stated herein, the Court concludes that, as a matter of law, the statute of repose in Miss. Code Ann. § 75-4-406(f) operates to bar Defendants from objecting to the unauthorized items paid by Plaintiff, regardless of whether or not Plaintiff paid the unauthorized items (i.e., checks) in good faith and/or with ordinary care. Therefore, Plaintiff's Motion will be granted as to Redbird's liability for the overdrawn amount of the Redbird Account.

The Court will then address whether Plaintiff is entitled to summary judgment against Lindley (via the Guarantee) for the overdrawn amount of the Redbird Account.[15] For the reasons stated herein, the Court concludes that, as a matter of law,[16] the Account Agreement is a "Related Document" under the Guarantee and therefore Lindley *can be* (and in fact, is) liable as guarantor for the overdrawn amount of the Redbird Account. Accordingly, Plaintiff's Motion will be granted

---

[15] As explained below, both Plaintiff and Lindley seek summary judgment on the issue of whether, as a matter of law, the Guarantee signed by Lindley extends to Redbird's obligations under the Account Agreement. In deciding that Plaintiff is entitled to summary judgment on this issue, the Court necessarily decides whether Lindley is entitled to summary judgment on the issue. Thus, in order to decide both Lindley's Motion and Plaintiff's Motion (with respect to the issue of Lindley's liability) the Court conducts a single analysis in which it evaluates the arguments made by each party in their respective Motions.

[16] Both Plaintiff and Lindley asked that the Court decide as a matter of law the issue as to Lindley's liability for the Redbird Account via the Guarantee.

as to Lindley's liability for the overdrawn amount of the Redbird Account, and Lindley's Motion[17] will be denied.

Next, the Court evaluates the affirmative defenses pled by Defendants in their Answer. (Doc. No. 15, "Answer").

Finally, the Court will consider the amount of damages to which Plaintiff is entitled (including pre-judgment interest) and whether Plaintiff is also entitled to attorney's fees.

## II. Article 4 of Mississippi's Version of the Uniform Commercial Code

This case arises under the Court's diversity jurisdiction and is governed by the substantive law of Mississippi. *See State Farm Mut. Auto. Ins. Co. v. LogistiCare Sols.*, LLC, 751 F.3d 684, 688 (5th Cir. 2014) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).[18] Mississippi has adopted Article 4 of the Uniform Commercial Code ("UCC"), as codified in Miss. Code Ann. §§ 75-4-101 through 504. "Article 4 governs bank deposits and collections, and specific to this action, sets forth the duties and liabilities of banks and their customers regarding the discovery and reporting of forged checks." *Redsands Energy, LLC v. Regions Bank*, 442 F. Supp. 3d 945 (S.D. Miss. 2020) (citing *Union Planters Bank, Nat. Ass'n v. Rogers*, 912 So. 2d 116, 117 (Miss. 2005)).

Under Article 4, a bank is generally liable to its customer if it charges the customer's account for an item that is not properly payable (such as an item with an unauthorized signature) from that account. Miss. Code Ann. § 75-4-401(a). However, UCC § 4-406 provides exceptions to this rule, whereby under certain circumstances the customer rather than the bank bears responsibility for a charged item that was not properly payable. Miss. Code Ann. § 75-4-406

---

[17] As indicated above, Lindley's Motion is technically a motion to dismiss the claims against him for failure to state a claim on which relief can be granted under Rule 12(b)(6), or, in the alternative, to grant summary judgment in his favor.

[18] The parties agree that Mississippi law governs this dispute.

reflects an underlying policy that furthers the UCC's "objective of promoting certainty and predictability in commercial transactions." *Rogers*, 912 So. 2d. at 121. Section 75-4-406 "allocate[es] responsibility among the parties according to whomever is best able to prevent a loss." *Id*.

> Section 4–406 acknowledges that the customer is best situated to detect unauthorized transactions on his own account by placing the burden on the customer to exercise reasonable care to discover and report such transactions. The customer's duty to exercise this care is triggered when the bank satisfies its burden to provide sufficient information to the customer. As a result, if the bank provides sufficient information, the customer bears the loss when he fails to detect and notify the bank about unauthorized transactions. *See, e.g., Am. Airlines Employees Fed. Credit Union v. Martin*, 29 S.W.3d 86, 92 (Tex. 2000).

*Id*.

So Miss. Code Ann. § 75-4-406 provides statutory defenses to the bank, pursuant to a rather tortuous set of rules (including, prominently, exceptions to otherwise applicable defenses) if the bank makes account statements available to the customer. The foundation of those defenses is the following subsection of Miss. Code Ann. § 75-4-406:

> If a bank sends or makes available a statement of account or items . . . the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because of a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

Miss. Code Ann. § 75-4-406(c). Under this subsection, assuming that (as undisputedly was the case here) the bank makes account statements available to the customer, then the customer has a duty (hereinafter, "examination-and-notification duty") to "exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because of a purported signature by or on behalf of the

customer was not authorized" and to notify the bank of facts regarding any unauthorized payments that the customer "reasonably should have discovered." *Id.*

Miss. Code Ann. § 75-4-406(d), in turn, provides the bank with statutory defenses, under certain circumstances, when the customer violates the examination-and-notification duty. In particular, in the event of such a violation, the customer is precluded from asserting against the bank the customer's unauthorized signature if the bank proves that it suffered a loss because of the customer's violation. Miss. Code Ann. § 75-4-406(d)(1). And under certain circumstances, Miss. Code Ann. § 75-4-406(d)(2) effectively provides the bank a defense to—or "preclusion" of— liability (hereinafter, "the same-wrongdoer preclusion") for repeated forgeries by the same wrongdoer.[19] Miss. Code Ann. § 75-4-406(d)(2). That is, in the event of a violation of the examination-and-notification duty, the customer is precluded from asserting against the bank "[t]he customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank," but only if "the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding thirty (30) days, in which to examine the item or statement of account and notify the bank." Miss. Code Ann. § 75-4-406(d)(2).

But the same-wrongdoer preclusion is not necessarily a *complete* defense for the bank, because under certain circumstances it becomes a *comparative fault* defense. That is, if the customer establishes that the bank failed to exercise ordinary care in paying the item and that the

---

[19] Subsection 2 is referred to as the "same[-]wrongdoer preclusion." *Redsands*, 442 F. Supp. 3d at 953.

failure substantially contributed to loss, the "same wrongdoer" preclusion is converted to a comparative fault defense for the customer. Miss. Code Ann. § 75-4-406(e).[20]

Moreover, Miss. Code Ann. § 75-4-406(e) provides an exception to the same-wrongdoer preclusion. Specifically, if the customer proves that the bank paid an item, but not in good faith, then the same wrongdoer-preclusion does not apply, and the loss falls entirely on the bank. Miss. Code Ann. § 75-4-406(e). "Good faith" in this context means "honesty in fact and the observance of reasonable commercial standards of fair dealing."[21] Miss. Code Ann. § 75-1-201(b)(20).

Finally, banks potentially have available an additional defense having nothing to do with the same-wrongdoer defense. "Miss. Code Ann. § 75-4-406(f) is a statute of repose that places an absolute time limit on the right of a customer to make claim for payment of a forged item." *Redsands*, 442 F. Supp. 3d at 953 (quoting Miss. Code Ann. § 75-4-406(f)). "If a customer fails to report the item within a one-year period," then the customer is subject to what the Court will call "repose preclusion"— *i.e.*, the customer "is precluded from objecting to the item 'without regard to care or lack of care of either the customer or the bank.'" *Id*. Section 75-4-406(f) "clearly limits the liability of the bank to one year after the statement was made available to the customer." *Century Const. Co., LLC v. Bancorpsouth Bank*, 117 So. 3d 345, 348 (Miss. Ct. App. 2013).

---

[20] "Ordinary care" is defined as "observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged." Miss. Code Ann. § 75-3-103(9). Reasonable commercial standards are, in turn, defined as "general banking usage not disapproved by" other provisions of the UCC. *Id*.

"In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this chapter or Chapter 4." Miss. Code Ann. § 75-3-103(a)(9).

[21] As the Comments to Miss. Code Ann. § 75-4-103 note, the term "bad faith" is not defined by the statute, but "the connotation is the absence of good faith." Herein, the Court uses "in bad faith" synonymously with "not in good faith" and likewise uses "bad faith" synonymously with the "absence of good faith." So for the Court to say an item was paid in bad faith is equivalent to saying an item was paid, but not in good faith.

Although Mississippi law allows parties to vary by agreement the provisions of Miss. Code Ann. § 75-4-406, parties "cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure." Miss. Code Ann. § 75-4-103. And Mississippi "[c]ourts routinely enforce deposit agreements that modify the reporting periods in UCC § 4-406 within which a customer may claim that a signature or alteration is unauthorized." *Redsands*, 442 F. Supp. 3d at 953 (citing *Century Const. Co., LLC*, 117 So. 3d at 348-49; *Rogers*, 912 So. 2d at 121). The statutory repose period is just such a reporting period, as it provides an outer time limit for a customer to "discover and report the customer's unauthorized signature on [an] item." Miss. Code Ann. § 75-4-406(f).

The Account Agreement includes terms consistent with the examination-notification duty, same-wrongdoer preclusion, and repose preclusion set forth in Miss. Code Ann. § 75-4-406. (*See* Doc. No. 1-4 at 18). Importantly, however, the Account Agreement modifies the reporting periods in Miss. Code Ann. § 75-4-406 (as permitted by Mississippi law) by shortening the default one-year repose period in Miss. Code Ann. § 75-4-406(f) to 60 calendar days.

## III. Plaintiff's Motion

### A. Redbird's Liability Via the Account Agreement

According to Plaintiff, Redbird is responsible,[22] per the Account Agreement and consistent with Mississippi law, for the amount that the Redbird Account was overdrawn. The Account Agreement states:

---

[22] Although Plaintiff asserts that both Redbird and Lindley are liable for the amount the Redbird Account was overdrawn, in this section of its analysis, the Court considers only whether Plaintiff is entitled to summary judgment on the issue of whether Redbird is liable (via the Account Agreement) for the overdrawn amount. Below, the Court evaluates whether Plaintiff is entitled to summary judgment on the issue of whether Lindley can also be held liable, via the Guarantee, for the overdrawn amount of the Redbird Account.

If any item you deposit to your account or you cash is returned unpaid, [Plaintiff] ha[s] the right to debit your account for the amount of such item . . . even if the debit . . . results in . . . overdrafts . . . . You will, in any event, be liable to [Plaintiff] for the amount of any item you deposit to your account or receive cash, that is returned unpaid, plus [Plaintiff's] costs and expenses associated with the collection of all or any part of such amount from you, including reasonable attorneys' fees.

(Doc. No. 53 at 10 (citing Doc. No. 1-4 at 4)).[23]

---

[23] The relevant provision in the Account Agreement states, "If any item you [Redbird] deposit to your account or you cash *is returned unpaid*, [Plaintiff] ha[s] the right to debit your account for the amount of such item." (Doc. No. 1-4 at 4) (emphasis added). Thus, this provision appears to apply only to items (i.e., checks) that are deposited *into* the Redbird Account and later "returned unpaid" by Plaintiff to the respective drawee banks, and not to items (i.e., checks) that are drawn on the Redbird Account. Plaintiff makes a distinction relevant to this point, stating "[t]here are two types of check [sic] at issue in the Redbird Account." (Doc. No. 72 at Par. 34). Plaintiff explained in more detail the difference between these two types of checks as follows:

> First there are checks that Sparks was writing from his accounts at other banks which he "*deposited into the Redbird account*" (i.e., money coming into the account). Those checks were necessarily signed "Nathaniel Sparks" and thus it is presumed that Nathaniel Sparks wrote them. Some of them were not good (i.e., Sparks did not have sufficient funds in his accounts at other banks to justify any provisional credit given to the Redbird Account). [Plaintiff] had to make a decision whether to re-run the checks through Sparks's accounts at those other banks (in case there were now adequate funds in those accounts) or to simply "charge back" those checks (i.e., to remove from the Redbird Account any provisional credit [Plaintiff] had given Redbird for those deposits.
>
> . . .
>
> Second, by contrast, there are the Redbird checks that Redbird allowed Sparks to access. Redbird permitted Sparks to use certain of those checks and to sign them sign "Dennis Lindley." Lindley Depo. at 101, 103-106, 109-113, 115-118, 123-126, 132-135, 172-173, and Exh. 26. These were checks being "*written on the Redbird Account*" (i.e., money going out of the account). Defendants now claim that Sparks's use of some of these checks, all also signed "Dennis Lindley," was unauthorized, although Defendants did not report them as such to [Plaintiff] as the applicable law and the Redbird Account Agreement required. Miss. Code Ann. § 75-4-406 (c), (d), and (f); Redbird Account Agreement at 17 (*See* "Statements"). All of these checks were signed "Dennis Lindley."

(Doc. No. 72 at Par. 34).

It would appear that the provision in the Account Agreement quoted above would not apply to the "Redbird checks" (i.e., type 2 checks) that were being drawn on the Redbird Account by Sparks (but signed "Lindley"), as those checks were not being "deposit[ed in]to" the Redbird Account or "cash[ed]" and later returned unpaid. Rather, as indicated above, the type 2 checks were being *drawn on* the Redbird Account. However, Plaintiff's claim is based on allegations that the Redbird Account became overdrawn when Plaintiff gave Redbird provisional credit for checks from other (drawee) banks deposited into the Redbird

The Account Agreement also states that "[i]f your account is overdrawn, you [Redbird] agree to immediately repay [Plaintiff]," (Doc. No. 53 at 10 (citing Doc. No. 1-4 at 13-14)), and that Redbird is responsible for collection costs and attorney's fees incurred in collecting the money Plaintiff paid in Redbird's overdraft. (Doc. No. 53 at 10 (citing Doc. No. 1-4 at 4, 14)). Thus, under the terms of the Account Agreement, Redbird (and potentially Lindley, via the Guarantee) would appear to be clearly liable for the overdrawn amount of the Redbird Account.

Moreover, it is undisputed that at the end of each month, Plaintiff sent Redbird (and Redbird admittedly received) bank statements regarding the Redbird Account, and that under the Account Agreement, Redbird was contractually obligated to examine and notify Plaintiff of any unauthorized item in writing within 30 days after the statement was made available.[24] And, under the Account Agreement and Miss. Code Ann. § 75-4-406(d)–(f), if Redbird failed to notify Plaintiff of an unauthorized item within *60 days*[25] after the statement was made available to

---

Account (type 1 checks) and Redbird spent those provisionally credited funds (via type 2 checks) before the type 1 checks were returned as having insufficient funds. (*See* Doc. No. 1 at ¶¶ 25-26). So although the factual dispute primarily revolves around type 2 checks (which are not covered by the provision in the Account Agreement on its face), the overdrawn amount that Plaintiff seeks to recover actually is based on the return of type 1 checks that were deposited into the Redbird Account (and thus, would be covered by the provision in the Account Agreement); Plaintiff's claimed loss amount is based not on the amount of type 2 checks that were unauthorized, but rather than amount of type 1 checks that were returned by Plaintiff to the respective drawee banks.

[24] Redbird also bore, by statute (as opposed to by contract), the examination-notification duty as defined above. That is, Redbird was also obligated under Miss. Code Ann. § 75-4-406(c) to examine the bank statements and notify Plaintiff of any unauthorized items within a reasonable period of time. As indicated above, to the extent that Redbird failed to do so, Redbird would be precluded from asserting against Redbird's unauthorized signature on the item and (pursuant to the "same wrongdoer exclusion" as defined above) precluded from asserting the unauthorized signature by the same wrongdoer on any other item paid in good faith by Plaintiff if the payment was made before Plaintiff received notice from Redbird of the unauthorized signature and after Redbird received a reasonable period of time (up to 30 days) to examine the item and notify Plaintiff. *See* Miss. Code Ann. § 75-4-406(d).

[25] As explained above, the Account Agreement executed by Redbird modified the reporting periods in Miss. Code Ann. § 75-4-406 by shortening the default one-year repose period in Miss. Code Ann. § 75-4-406(f) to 60 calendar days. As noted above, "Courts routinely enforce deposit agreements that modify the reporting

Redbird, the loss caused by that unauthorized item and any other unauthorized item by the same wrongdoer would fall entirely on Redbird (and also, potentially, on Lindley via the Guarantee) without regard to care or lack of care on the part of Plaintiff.

Even though both the Account Agreement and Mississippi law appear to favor Plaintiff, Redbird argues that Miss. Code Ann. § 75-4-406(e) allows Redbird to assert against Plaintiff the unauthorized items, or at least allows Redbird to shift some of the loss to Plaintiff. As explained above, regardless of whether a customer complies with the examination-notification duty, if a customer establishes that a bank failed to exercise ordinary care in paying an unauthorized item and that the failure substantially contributed to loss, the loss is allocated between the customer and the bank. *See* Miss. Code Ann. § 75-4-406(e). And if the bank paid an unauthorized item, but not in good faith, then the loss falls entirely on the bank. *See id*.

According to Redbird, Plaintiff's Motion must be denied because genuine questions of fact exist as to whether Plaintiff (i) exercised ordinary care in paying the unauthorized items, and (ii) paid the unauthorized items in good faith. As to ordinary care, Redbird argues that Plaintiff failed to exercise ordinary care when paying "unauthorized" checks presented by Sparks because Plaintiff "(1) failed to obtain proper, accurate, and complete documentation to open the checking account, (2) failed to properly monitor activity in the account, (3) allowed Sparks to conduct business through the checking account after having determined that Sparks may have been engaged in fraudulent activity in a previous account and deciding to prohibit Sparks from opening accounts

---

periods in UCC § 4-406 within which a customer may claim that a signature or alteration is unauthorized." *Redsands*, 442 F. Supp. 3d at 953 (citing *Century Const. Co., LLC*, 117 So. 3d at 348-49; *Rogers*, 912 So. 2d at 121). The statutory repose period is just such a reporting period, as it provides an outer time limit for a customer to "discover and report the customer's unauthorized signature on [an] item." Miss. Code Ann. § 75-4-406(f).

in the future, and (4) failed to consult with Redbird and Lindley about excessive NSF transactions and other suspicious activity in the account." (Doc. No. 63 at 18–19).

But whether or not Plaintiff exercised ordinary care in paying the unauthorized checks is irrelevant because the statute of repose in Miss. Code Ann. § 75-4-406(f) (as modified by the Account Agreement) bars Defendants from asserting against Plaintiff the unauthorized signature regardless of whether the bank exercised ordinary care. Under Miss. Code Ann. § 75-4-406(f), if a customer fails to report an item within a one-year (but potentially shorter, as discussed herein) period, the customer is precluded from objecting to the item, "'without regard to care or lack of care of either the customer or the bank.'" *Redsands*, 442 F. Supp. 3d at 953 (quoting Miss. Code Ann. § 75-4-406(f)). So under § 75-4-406, if a customer fails to report an item after the expiration of the one-year repose period, then the fact that a bank failed to exercise ordinary care in paying an item does not convert the preclusion to a comparative fault defense as it otherwise would under Miss. Code Ann. § 75-4-406(e). As noted above, via the Account Agreement executed by Redbird, the parties modified § 75-4-406(f) by shortening the repose period—as they are permitted to do under Mississippi law (*see* Miss. Code Ann. § 75-4-103)—from one year to 60 calendar days. Given this modification, by virtue of repose preclusion, Redbird is barred from asserting against Plaintiff an unauthorized signature that Redbird did not report within 60 calendar days, regardless of whether Plaintiff failed to exercise ordinary care in paying the item.

It is undisputed that the first unauthorized payment made from the Redbird Account was on September 17, 2021 (Check No. 1052) to a Sparks-owned business. (Doc. No. 65-1 at 112). It is also undisputed that Check No. 1052 was signed "Dennis Lindley" but written by Sparks and appeared on the September 2021 statement that Redbird received shortly after the end of September 2021. (*Id*. at 105-07). Because Redbird has not pointed to any evidence showing that it

notified Plaintiff of the first unauthorized item (Check No. 1052, paid on September 17, 2021) within 60 days of receiving the September 2021 statement, the statute of repose in Miss. Code Ann. § 75-4-406(f) (as modified by the Account Agreement), bars Redbird from asserting against Plaintiff the unauthorized signature regardless of whether Plaintiff exercised ordinary care. Accordingly, any failure by Plaintiff to exercise ordinary care in making that payment or any payment by the same wrongdoer will not convert the preclusion to a comparative fault defense, and Redbird must bear the loss of Check No. 1052 and any other items that contained the unauthorized signature of Sparks and were paid by Plaintiff.

Additionally, Redbird argues that it should not be responsible for the unauthorized payments because Plaintiff did not pay them in "good faith." To support the contention that Plaintiff did not make the payments in good faith, Redbird points to the expert report of Ronald Roberts, wherein Roberts concluded that Plaintiff failed to obtain proper documentation in opening the Redbird Account, failed to adequately monitor the Redbird Account, permitted Sparks to deposit money into the Redbird Account even after prohibiting Sparks from opening or using his own accounts with Plaintiff, and failed to disclose Sparks's past suspected fraudulent activity to Defendants. Roberts concludes from these findings—together with Plaintiff's knowledge of Sparks's history of suspected fraudulent activity as a customer of Plaintiff—that Plaintiff did not act in good faith in paying the unauthorized items.

But as with Redbird's ordinary care argument, Miss. Code Ann. § 75-4-406(f) (as modified by the Account Agreement) bars Redbird from asserting against Plaintiff the unauthorized signature regardless of whether Plaintiff paid the unauthorized items in good faith. Although Miss. Code Ann. § 75-4-406(f) refers only to "care or lack of care," it does say (without qualification that after the period of repose expires), the customer (i.e., Redbird) is precluded from asserting

against the bank (i.e., Plaintiff) any unauthorized signature. Section 75-4-406(f) does not include any carve out for situations involving bad faith, even if it is true that the statute refers only to "care" and not "bad faith." Therefore, whether Plaintiff paid the unauthorized items in good faith—even if a fact in genuine dispute—is not material to the outcome because Miss. Code Ann. § 75-4-406(f) (as modified by the Account Agreement) precludes Redbird from asserting against Plaintiff the unauthorized signature regardless of the Plaintiff's good faith (or lack thereof).

In sum, even if a genuine dispute exists as to whether Plaintiff exercised ordinary care in paying the unauthorized items, or acted in bad faith, those facts are *immaterial* because Miss. Code Ann. § 75-4-406(f) (as modified by the Account Agreement) precludes Redbird from asserting against Plaintiff the unauthorized signature regardless of any bad faith or failure to exercise ordinary care on the part of Plaintiff. Accordingly, Redbird is liable (via the Account Agreement) for the overdrawn amount of the Redbird Account.

B. Lindley's Liability Via the Guarantee

Via the Motion, Plaintiff requests that the Court enter summary judgment in its favor making Lindley liable for the overdrawn amount of the Redbird Account via the Guarantee that he signed. (Doc. No. 51 at 1-2).[26]

---

[26] Via Lindley's Motion, Lindley seeks summary judgment that he is not liable for the overdrawn amount of the Redbird Account via the Guarantee because (according to Lindley) the Guarantee does not extend to Redbird's obligations under the Redbird Account. So via Plaintiff's Motion and via Lindley's Motion, Plaintiff and Lindley respectively seek summary judgment on this issue (whether the Guarantee extends to Redbird's obligations under the Account Agreement, and thus, whether, via the Guarantee, Lindley can be held personally liable for the overdrawn amount of the Redbird Account). Lindley and Plaintiff agree that the Court should decide this issue as a matter of law.

     *The Account Agreement is Not Excluded from the Definition of "Related Documents" in the Guarantee by the Doctrine of Ejusdem Generis*

As indicated above, the Guarantee Lindley signed stated that Lindley, personally, "absolutely and unconditionally guarantees the payment and satisfaction of the Indebtedness of [Redbird] to [Plaintiff], and the performance and discharge of all [Redbird's] obligations under the [Redbird] Note and Related Documents." (Doc. No. 1-6).[27] Lindley argues that by signing the Guarantee, he guaranteed Redbird's satisfaction of only the Redbird Note, not any debts regarding the Redbird Account. Plaintiff, on the other hand, argues that the Account Agreement (i.e., the agreement governing the Redbird Account) is a "Related Document" as that term is defined in the Guarantee, and thus by signing the Guarantee, Lindley became personally responsible for Redbird's obligations with respect to the Redbird Account, including any debts arising from the Account Agreement.[28]

---

[27] "Related Documents" is defined in the Guarantee as "all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness." (*Id.*). "Indebtedness" is defined as: "all of the principal amount outstanding from time to time and at any times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations that [Redbird] individually or collectively or interchangeably with others, owes or will of the Note and Related Documents and any renewals, extensions, modifications, refinancings, consolidations and substitutions of the Note and Related Documents."

[28] The Account Agreement states:

> If any item you deposit to your account or you cash is returned unpaid, [Plaintiff] ha[s] the right to debit your account for the amount of such item . . . even if the debit . . . results in . . . overdrafts . . . . You will, in any event, be liable to [Plaintiff] for the amount of any item you deposit to your account or receive cash, that is returned unpaid, plus [Plaintiff's] costs and expenses associated with the collection of all or any part of such amount from you, including reasonable attorneys' fees." (Doc. No. 53 at 10 (citing Doc. No. 1-4 at 4)).

The Account Agreement also states that "[i]f [Redbird's] account is overdrawn, [Redbird] agrees to immediately repay [Trustmark]," (Doc. No. 53 at 10 (citing Doc. No. 1-4 at 13-14)), and that Redbird is responsible for "all collection costs and reasonable attorneys' fees" incurred in collecting the money Plaintiff paid for Redbird's overdraft. (Doc. No. 53 at 10 (citing Doc. No. 1-4 at 15)).

The parties' dispute regarding Lindley's potential liability via the Guarantee therefore turns on whether the Account Agreement constitutes a "Related Document" as that term is defined in the Guarantee, in which case the Guarantee would operate to make Lindley personally responsible for any debt incurred by Redbird via the Account Agreement.

Mississippi courts employ "a three-tiered approach to contract interpretation." *Tupelo Redevelopment Agency v. Abernathy*, 913 So. 2d 278, 284 (Miss. 2005). "First, [this Court] must determine whether the contract is ambiguous, and if it is not, then it must be enforced as written." *Epperson v. SOUTHBank*, 93 So. 3d 10, 16–17 (Miss. 2012). "Second, if the court is unable to translate a clear understanding of the parties' intent, the court should apply the discretionary "canons" of contract construction." *Abernathy*, 913 So. 2d at 284. And third, "if the contract continues to evade clarity as to the parties' intent, the court should consider extrinsic or parol evidence." *Id*. (citing *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 352 (Miss. 1990)).

Beginning with the first step, "[a] contract is ambiguous if it is 'susceptib[le] to two reasonable interpretations.'" *Epperson*, 93 So. 3d at 19 (citing *Dalton v. Cellular South, Inc.*, 20 So. 3d 1227, 1232 (Miss. 2009)). The Mississippi Supreme Court has stated:

> An "ambiguous" word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages[,] and terminology as generally understood in the particular trade or business.

*Id*. (citing *Dalton*, 20 So. 3d at 1232). "The mere fact that the parties disagree about the meaning of a provision of a contract does not make the contract ambiguous as a matter of law." *Delta Pride Catfish, Inc. v. Home Ins. Co.*, 697 So. 2d 400, 404 (Miss. 1997).

"Related Documents," as defined in the Guarantee, includes a list of specific loan documents followed by some catch all terms that were "executed in connection with the Indebtedness." Lindley argues that the Account Agreement does not constitute one of the types of

documents listed in the "Related Documents" definition because (according to Lindley), under the canon of *ejusdem generis*,[29] the "Related Documents" definition must be limited to include only documents that are specific to a loan transaction and are intended to ensure repayment of the borrowed amount or limit lender's liability.

As Plaintiff points out, Mississippi courts have held that *ejusdem generis* applies only when the contract is found to be ambiguous, *Yazoo Properties v. Katz & Besthoff No. 284, Inc.*, 644 So. 2d 429, 432 (Miss. 1994). This makes sense given that Mississippi law requires courts interpreting a contract to first determine whether a particular term is ambiguous; if and only if there is an ambiguity may the court apply canons of construction to interpret the contract. So the Court may not apply canons of construction unless and until it determines that the contractual term is ambiguous.

Nevertheless, Lindley insists that the canon of *ejusdem generis* must be used to *identify* an ambiguity in the contract—here, in the definition of "Related Document." According to Lindley, *ejusdem generis* applies where there is a pattern of general words following an enumeration of two or more things. In those situations (Lindley argues), the *ejusdem generis* canon instructs courts to read the initial terms as "providing context within which to interpret the general term" that follows. (Doc. No. 75 at 2).

But even assuming arguendo that *ejusdem generis* could be used at the first step of contract interpretation to identify an ambiguity, *ejusdem generis* is not applicable here because the "general" word or phrase ("all other instruments, agreements and documents") following the specific list of items is already constrained by the requirement that such "instruments, agreements

---

[29] *Ejusdem generis* dictates that "where an enumeration of specific things is followed by some more general word or phrase, such general word or phrase is to be held to refer to things of the same kind, as in the case of a 'clean-up' phrase, such as the term 'otherwise' with respect to a classification which immediately precedes it." *Morgan v. State ex rel. Dist. Atty.*, 44 So. 2d 45, 49 (Miss. 1950).

and documents" be "*executed in connection with* the Indebtedness." Although "executed in connection with" provides a broad range of documents that might fall within its meaning, it does provide *some* limitation, and one that is clear and unambiguous. Therefore, the Court finds that the canon of *ejusdem generis* is not applicable and that the Account Agreement constitutes a "Related Document," within the meaning of the Guarantee.

> ii. *The Account Agreement Was "Executed in Connection with" the LOC and Redbird Note*

Next, the Court must decide whether the Account Agreement was unambiguously a document "executed in connection with" the Redbird Note. Lindley argues that "in connection with" must be read narrowly as including *only* documents that were executed "as part of the loan transaction itself," and that under such a reading, the Account Agreement is not a document "executed in connection with" the Redbird Note and LOC. (Doc. No. 75 at 4). The Court, however, does not find this to be a reasonable interpretation based on the plain meaning of "connection."

"Connection" is defined as "a causal or logical relation or sequence" or "contextual relation or association." Merriam-Webster Online Dictionary, (https://www.merriamwebster.com/dictionary/connection). Applying this definition,[30] a document is "executed in connection with" the Redbird Note and LOC so long as there is a logical relationship between the document and the Redbird Note and LOC. This definition only makes sense; reading "in connection with" to refer only to loan-transaction documents (as Lindley urges the Court to do) would unreasonably narrow the types of documents that could be included.[31] Such

---

[30] *See Vigne as Next Friend of Bias v. Lee*, 491 F. Supp. 3d 200, 203 (S.D. Miss. 2020) (noting that Mississippi courts may "consult leading dictionaries" to determine the plain and ordinary meaning of a contract term).

[31] Lindley argues that applying the dictionary definition of "connection" above puts no limit on the scope of the phrase "in connection with." According to Lindley, there could be "connections" consistent with the

a narrow reading would contradict the context of the definition of "Related Documents," which itself contemplates much more than only loan documents. (*See* Doc. No. 1-6 at 2). It also would be in tension with the general truism that courts in a variety of contexts generally consider the term "in connection with" to be broad. *See, e.g.*, *Firexo, Inc. v. Firexo Grp. Ltd.*, 99 F.4th 304, 307 (6th Cir. 2024) ("This language appears very broad: i.e., '*any dispute ... in connection with*.'"); *Mason v. Praxair, Inc.*, No. 3:06 CV 218 R, 2006 WL 2385360, at *3 (W.D. Ky. Aug. 16, 2006) (referring to the defendant's "correct assertion that the term 'in connection with' is a broad one and has been given broad application." (citing *Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716, 721 (9th Cir.1999))); *In re Campbell*, 259 B.R. 615, 626 (Bankr. N.D. Ohio 2001) ("The scope of the phrase 'in connection with the case' is broad."). "'In connection with' can bear a "broad interpretation," *Mont v. United States*, 587 U.S. 514, 515 (2019) (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006)), and the Court sees no basis for such a narrow interpretation. And the Court need not determine the "outer bounds" of the term, *id.*, in order to say that the term is broad enough to cover what it allegedly covers here, *i.e.*, the Account Agreement.

Had the parties wished to limit the definition of Related Documents to include only loan-transaction documents, they could have clearly done so (for example, by referring to "related loan documents"). Seeing that they did not, the Court must enforce the Guarantee as written, i.e., as unambiguously broad enough to cover the Account Agreement.

Considering the undisputed facts together with the unambiguous language in the Account Agreement, the Court concludes that the Account Agreement was clearly related to and "executed in connection with" the Redbird Note and LOC. The Redbird Account specifically states—and

---

dictionary definition between the Redbird Note and "every other document signed with a pen." (Doc. No. 75 at 4-5). However, this argument ignores the fact that the dictionary definition of "connection"—though certainly broad—requires not just any relation whatsoever, but a "logical" or "contextual" relation.

Lindley acknowledged, via signature—that it was opened "to be used for draws" from the LOC. (Doc. No. 1-3). Thus, the record shows that the Redbird Account was opened for the specific purpose of accepting advances from the LOC. The fact that the Account Agreement was executed in the presence of a separate employee does not render it unrelated to the Redbird Note or LOC. Moreover, the Redbird Note likewise demonstrates a connection to the Redbird Account by defining "default" as the failure to "comply with or to perform any term, obligation, covenant or condition contained in *any other* agreement between [Plaintiff] and [Redbird]." (Doc. No. 1-1 at 1) (emphasis added). The Redbird Note thus reiterates the parties' intent that the Guarantee would cover Redbird's obligations *beyond* the LOC (and extending to Redbird's obligations under the Account Agreement).

The Court therefore concludes that, as a matter of law, the Guarantee extends to Redbird's obligations under the Account Agreement. Moreover, because (for the reasons stated above) Redbird is liable under the Account Agreement for the overdrawn amount of the Redbird Account, so too Lindley is personally responsible (via the Guarantee) for the overdrawn amount of the Redbird Account.

Thus, Plaintiff's Motion will be granted as to Defendants' liability, and Plaintiff is entitled to summary judgment for the overdrawn amount of the Redbird Account against Redbird (via the Account Agreement) and Lindley (via the Guarantee).

## IV. Lindley's Motion:

The Court incorporates by reference the above analysis with respect to the issue of whether the Guarantee extends to Redbird's obligations under the Account Agreement. Based on that analysis, Lindley's Motion will be denied.

## V. Defendants' Affirmative Defenses (If Not Abandoned) Fail as a Matter of Law

### A. Overview of Defendants' Asserted Affirmative Defenses

Via their Answer, Defendants assert four affirmative defenses: waiver and estoppel, unclean hands, breach of covenant of good faith and fair dealing, and failure to mitigate damages. (Doc. No. 15). Plaintiff argues that each of the asserted affirmative defenses fail as a matter of law.

Defendants make no effort whatsoever to respond to any of the arguments made by Plaintiff as to why Plaintiff's purported affirmative defenses fail as a matter of law. In fact, Defendants do not even mention these defenses specifically in their Response to Plaintiff's Motion. Rather, they appear to abandon them and rely solely on the protections provided by Mississippi's UCC. For this reason, these defenses have been abandoned and do not serve to prevent summary judgment in favor of Defendants.

But alternatively, even if Defendants had not abandoned these affirmative defenses, Plaintiff is correct that they fail as a matter of law.

### B. Waiver and Estoppel

Defendants assert that Plaintiff waived its claims against Redbird or should be estoped from pursuing them on the basis that (1) Plaintiff provided "immediate credit on deposits into the Redbird Account that were returned by the drawee bank for insufficient funds," and (2) Lindley's signature on certain Redbird checks was unauthorized. (Doc. No. 51-9 at 5-7). But, as Plaintiff points out, the Funds Availability Disclosure (Doc. No. 51-10), which Defendants acknowledged receiving by signing the Redbird Signature Card (Doc. No. 51-11), clearly and unambiguously stated Plaintiff's policy of providing provisional credit on deposits the first business day after the date the item is deposited. (Doc. No. 51-10 ("Our policy is to make funds from your check and cash deposit . . . available to you on the first business day after the day we receive your deposit.")). Especially in light of Defendants' failure to even address this issue in their Response to Plaintiff's

Motion, the Court sees no reason to conclude that Plaintiff has waived its claims (or should be estopped from pursuing them) and thus bear the loss of the overdrawn amount simply because Plaintiff provided credit in exactly the manner that it disclosed it would.

Moreover, the fact that Lindley's signature on certain Redbird checks was unauthorized is not grounds for waiver or estoppel of Plaintiff's claims. Defendants admit that Lindley authorized Sparks to write at least *some* checks on the Redbird Account (Doc. No. 64 at 10), as permitted by the Account Agreement. (*See* Doc. No. 1-4 at 9 ("You [Redbird] (through a power of attorney, authorized signer, bill-paying arrangement, or other method) may authorize another person to conduct transactions on your account . . ."); *id*. at 5 ("You agree that any one of you (or any authorized signer or any person authorized by you to do transfers, withdrawals or transactions on your account) may withdraw or transfer all or any part of the funds in your account.")). But as Plaintiff points out, the Account Agreement also states, clearly and unambiguously, that Redbird "will not hold [Plaintiff] responsible if someone you authorized misapplies your money[,]" and that Redbird "assume[s] all risk of improper acts by such person." (*Id*. at 9). Given this clear contractual language, Defendants cannot assert on the basis that Lindley's signature on certain Redbird checks was unauthorized that Plaintiff has waived its claims or should be estopped from pursuing them.

C.  Implied Covenant of Good Faith and Fair Dealing

Defendants also contend that they cannot be liable for the overdrawn amount of the Redbird Account under the Account Agreement because (according to Defendants) Plaintiff first breached the implied covenant of good faith and fair dealing by (the same actions discussed above with respect to waiver and estoppel): (1) providing immediate credit on deposits into the Redbird Account that were returned by the drawee bank for insufficient funds, and (2) processing payments for Redbird checks on which Lindley's signature was unauthorized. However, Defendants do not

explain how these actions were inconsistent with the terms of the Account Agreement and Funds Availability Disclosure (Doc. No. 51-10), which (as indicated above) Defendants acknowledged receiving by signing the Redbird Signature Card (Doc. No. 51-11). Thus, under Mississippi law, Defendants have not shown that Plaintiff breached the implied covenant of good faith and fair dealing. *See Caplinger v. Whitney Bank¸* 293 So. 3d 307, 313 (Miss. Ct. App. 2020) ("A party has not breached implied covenant of good faith and fair dealing when it took only actions which were authorized by contract." (quoting *Limbert v. Miss. Univ. for Women Alumnae Ass'n*, 998 So. 2d 993, 998 (¶14) (Miss. 2008))).

D. Failure to Mitigate Damages

Defendants also assert Plaintiff failed to mitigate damages by, again, (1) providing immediate credit on deposits into the Redbird Account that were returned by the drawee bank for insufficient funds, and (2) processing payments for Redbird checks on which Lindley's signature was unauthorized. (Doc. No. 51-9 at 6, 9). However, Defendants again fail to explain how these actions by Plaintiff deviated from what the express terms of the Account Agreement required Plaintiff to do. Moreover, Defendants themselves admit that it did not bring to Plaintiff's attention the fact that certain checks signed by Sparks were unauthorized until months after the first check was paid by Plaintiff. Accordingly, Defendants cannot show that Plaintiff failed to mitigate damages.

E. Unclean Hands

Finally, Defendants also invoke (via their Answer) the defense of unclean hands. But under Mississippi law, the doctrine of unclean hands "prevents a complaining party from obtaining *equitable* relief when he is guilty of willful misconduct in the transaction at issue." *Stewart v. Stewart*, 309 So. 3d 44, 71 (Miss. Ct. app. 2020) (emphasis added). But here, Plaintiff seeks only

money damages, not equitable relief. Accordingly, Defendants' unclean-hands defense fails as a matter of law.

## VI. Damages

### A. Damages and Attorney's Fees Sought by Plaintiff

Plaintiff seeks judgment against both Defendants for the overdrawn amount of the Redbird Account in the total amount of $455,724.17, together with pre-judgment interest. Additionally, Plaintiff seeks an award against both Defendants for reasonable attorney's fees and expenses incurred in collecting the overdrawn amount of the Redbird Account. (Doc. No. 1 at 9).[32]

### B. The Overdrawn Amount of the Redbird Account

Although Defendants challenge (unsuccessfully, as discussed above) their liability as to the overdrawn funds in the Redbird Account, they do not dispute that the amount of the overdraw is $455,724.17. Accordingly, the Court finds that Plaintiffs are entitled to judgment in the amount of $455,724.17, together with pre-judgment interest. In addition, post-judgment interest on this judgment amount shall accrue under 28 U.S.C. § 1961.

State law governs awards of pre-judgment interest in diversity cases. *F.D.I.C. v. First Heights Bank, FSB*, 229 F.3d 528, 542 (6th Cir. 2000); *see also In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 497 (6th Cir. 2013) ("[I]t is well-accepted that a federal court sitting in diversity should use the state-law interest rate when awarding prejudgment interest . . ." (citing *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 333 (6th Cir. 2007))). Under

---

[32] As indicated in a footnote above, after Plaintiff filed this lawsuit, Defendants paid the portion of attorney's fees and expenses that Plaintiff incurred in the collection of the balance of the Redbird LOC amount. (*See* Doc. Nos. 53 at 8; 64 at 18). Accordingly, the Court construes Plaintiff's demand for reasonable attorney's fees and costs as being limited to those incurred in connection with the enforcement and collection of the overdrawn amount of the Redbird Account (even though in the Complaint Plaintiff demands "reasonable attorneys' fees and costs incurred in connection with attempting to enforce/collect the *Indebtedness* at issue (resulting from both the Redbird LOC and the related overdrawn Redbird Account)"). (Doc. No. 1 at ¶¶ 35, 38) (emphasis added).

Mississippi law, pre-judgment interest may be awarded in breach-of-contract cases. *Biel Reo, LLC v. Lee Freyer Kennedy Crestview, LLC*, 242 So. 3d 833, 845 (Miss. 2018). As to the interest rate that the Court should apply, Mississippi Code Section 75–17–7 states:

> All judgments or decrees founded on any sale or contract shall bear interest at the same rate as the contract evidencing the debt on which the judgment or decree was rendered. All other judgments or decrees shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint.

Miss. Code Ann. § 75–17–7. The Redbird Note sets an interest rate of 4.250% per annum on the unpaid outstanding principal balance of the loan Redbird received. (Doc. No. 1-1 at 1). In the event of default, that interest rate climbs to 7.250% per annum. (*Id*.). However, the Account Agreement—which is the contract underlying Redbird's liability (and, together with the Guarantee, Lindley's liability)—does not set any interest rate to be applied to the outstanding balance of the overdrawn amount. As noted in Plaintiff's Memorandum, Defendants already paid the principal amount and interest due on the Redbird Note. (Doc. No. 53 at 8). And because nothing in the Redbird Note indicates that the interest rate applicable to the Redbird Note also applies to the Redbird Account, the Court must set an interest rate (one not necessarily consistent with the Redbird Note), along with a date from which that interest should begin to accrue.

Here, the Court in its discretion finds it appropriate to apply a prejudgment interest rate of 4.25% per annum, beginning from the date Defendants were served (August 24, 2022). (Doc. No. 9). This amount compensates Plaintiff for not having the use of funds Plaintiff otherwise would have had use of (at a rate that Plaintiff at the outset found acceptable when parting with its funds in the first place) without imposing a higher "default" rate that is essentially punitive—something that the Court finds inappropriate here given that it finds Defendants' arguments non-frivolous and that it appears that Lindley and Redbird (as an entity) were, unlike Sparks, not bad-faith operators.

Accordingly, Plaintiff is entitled to a judgment of $455,724.17, plus pre-judgment interest, which has accrued from August 24, 2022, at a rate of 4.25% per annum. As of the date of entry of the judgment, August 23, 2024, pre-judgment interest amounts to $38,736.55. In addition, post-judgment interest on this judgment amount shall accrue under 28 U.S.C. § 1961.

C. Attorney's Fees

Pursuant to Fed. R. Civ. P. 54(d)(2)(A), "claim[s] for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Thus, Rule 54(d) "generally prescribes that claims for attorney's fees must be made by motion, but carves an exception where 'the substantive law requires those fees to be proved at trial as an element of damages.'" *Richardson v. Wells Fargo Bank, N.A.*, 740 F.3d 1035, 1037 (5th Cir. 2014). A district court in this Circuit aptly explained Rule 54(d)(2)(a) as follows:

> [Rule 54(d)(2)(A)] distinguishes legal fees that are sought as damages based on the substantive law of the claim before the trial court with legal fees that are "collateral to the merits and awarded only after" the adjudication of the relevant claims and entry of judgment. *See Clarke v. Mindis Metal, Inc.*, No. 95-5517, 1996 WL 616677, at *3 (Oct. 24, 1996). If attorneys' fees are collateral such that they are to be awarded after the claims have been resolved, then under Rule 54(d), the litigant must claim the fees by filing a motion pursuant to that Rule within 14 days following entry of judgment. Fed. R. Civ. P. 54(d)(2)(A); *see Clarke*, 1996 WL 616677 at *3.
>
> Conversely, if attorneys' fees are to be awarded as an element of damages according to the substantive law governing the action, the fees must be sought and proved before the conclusion of the proceedings rather than after judgment has already been entered via a Rule 54(d) motion. Indeed, "Rule 54(d)(2) is not applicable to attorneys' fees recoverable as an element of damages". *Capital Asset Research Corp. v. Finnegan*, 216 F.3d 1268, 1270 (11th Cir. 2000) (citing Fed. R. Civ. P. 54 Advisory Committee's Note). As a result, when a party seeks an award of attorneys' fees as damages under the substantive law governing the action, "the correct procedure is to plead the attorney's fees at trial." *Dryvit Systems, Inc. v. Great Lake Exteriors, Inc.*, 96 Fed. Appx. 310, 311 (6th Cir. 2004); *see also Rissman v. Rissman*, 229 F.3d 586, 587-88 (7th Cir. 2000) (noting that, when attorneys' fees are awarded pursuant to the substantive law, the party "must raise

its claim in time for submission to the trier of fact, which means before trial rather than after").

*Vaughn v. Konecranes, Inc.*, No. CV 5:14-136-DCR, 2016 WL 5219586, at *3 (E.D. Ky. Sept. 19, 2016).

Plaintiff's claim for attorney's fees arises under the Account Agreement, which provides:

> If any item you [Redbird] deposit to your account or you cash is returned unpaid, we have the right to debit your account for the amount of such item . . . even if the debit . . . results in . . . overdrafts . . . . You [Redbird] will, in any event, be liable to us for the amount of any item you deposit to your account or receive cash that is returned unpaid, *plus our costs and expenses associated with collection of all or any part of such amount from you, including reasonable attorneys' fees*."

(Doc. No. 1-4 at 5) (emphasis added).[33]

Although Plaintiff relies on a contractual provision as the basis for its purported entitlement to attorney's fees, neither Plaintiff nor Defendants take any position as to whether the attorney's fees claimed by Plaintiff are an element of *damages*, such that they must be proven at trial, or collateral litigation costs, such that they should be awarded (if at all) only after Plaintiff has filed a post-judgment motion under Rule 54(d).[34] In the absence of any arguments by the parties

---

[33] The Account Agreement also states more generally:

> You [Redbird] agree to indemnify us against, and hold us harmless from, any and all losses, damages, costs, and attorney's fees that we incur because of your failure to abide by any terms of this Agreement.

(Doc. No. 1-4 at 4). Elsewhere, the Account Agreement also states that if the Redbird Account is overdrawn, Redbird "agree[s] to pay all collection costs and reasonable attorney's fees." (Doc. No. 1-4 at 15).

[34] Plaintiff states that, as of December 15, 2023, it incurred attorney's fees in the amount of $163,141.36 in connection with collecting the overdrawn amount of the Redbird Account. (Doc. No. 53 at 20). But presumably that figure would differ from the total amount of attorney's fees Plaintiff now seeks, given that Plaintiff certainly engaged in substantive legal work (including by responding to Lindley's Motion) after December 15, 2023. Although Defendants do not dispute the amount of attorney's fees stated by Plaintiff ($163,141.36), Plaintiff offers no evidence supporting that this amount (or any greater amount it might now claim) is in fact reasonable. Without any indication of the total amount of fees Plaintiff seeks, or any evidence demonstrating that those fees are reasonable, the Court cannot possibly determine whether

regarding this distinction, the Court must determine for itself whether the attorney's fees contemplated in the Account Agreement are an element of damages.[35] The Court concludes they are not. The Account Agreement makes clear that, in the event of a default by Redbird, Redbird is liable to Plaintiff for the amount of any item that is returned unpaid (i.e., any damages suffered by Plaintiff as a result of Redbird's default). And in addition to, but *separate from*, that damages amount, Plaintiff is entitled to the costs of collecting said damages under the Account Agreement, "including reasonable attorney's fees." Treating the attorney's fees Plaintiff claims as a collateral matter (as opposed to an element of damages), is consistent with Mississippi law, which provides that "[i]f independent grounds for attorney's fees exist, a trial judge may award such fees collaterally."[36] *Fulton v. Mississippi Farm Bureau Cas. Ins. Co.*, 105 So. 3d 284, 288 (Miss. 2012).

---

Plaintiff is entitled to those fees. This is yet another reason (in addition to those stated below) that the Court finds it appropriate to deal with the issue of attorney's fees via a post-judgment motion filed pursuant to Rule 54(d).

[35] In an unpublished case, the Sixth Circuit held that attorney's fees were not a collateral matter where the contract contained an attorney's fees provision, because in that case "[t]he 'substantive law,' i.e., the contract, placed the attorney's fees claim at the heart of the case." *Clarke*, 1996 WL 616677, at *7, *9. *Clarke* reached this conclusion, in part, based on the Advisory Committee's notes to the 1993 amendments to the Federal Rules of Civil Procedure, which states:

> [Rule 54(d)(2)] does not . . . apply to fees recoverable as an element of damages, as when sought under the terms of a contract; such damages typically are to be claimed in a pleading and may involve issues to be resolved by a jury.

Fed. R. Civ. P. 54(d)(2) advisory committee's note (1993). However, as the Fifth Circuit has pointed out, the Advisory Committee's Note "set[s] no bright-line rule that fees sought under the terms of '*any* contract' or '*all* contracts' must be considered damages. Instead, attorney's fees provided by contract are an example of fees that *might* be recoverable as an element of damages." *Richardson v. Wells Fargo Bank, N.A.*, 740 F.3d 1035, 1039 (5th Cir. 2014). "The language of the contract and the nature of the claim are the dispositive factors concerning whether the fees are an element of damages or collateral litigation costs." *Id.* And here, the Court finds that both the language of the contract and the nature of the claim support a finding that the attorney's fees are collateral litigation costs, rather than damages, that must be awarded (if at all) after the filing of a post-judgment Rule 54(d) motion.

[36] Under Mississippi law, "independent grounds" warranting attorney's fees means "some statutory authority or contractual provision" providing for attorney's fees, or an award of punitive damages. *Fulton*, 105 So. 3d at 278–88.

Thus, Mississippi law implicitly recognizes the point the Court makes here—that although a contract may provide an "independent ground" for attorney's fees, those attorney's fees are not necessarily an element of damages. Rather, they are the costs of collecting the damages to which Plaintiff is entitled, and thus must be awarded (if at all) collaterally through a post-judgment motion filed pursuant to Rule 54(d).

Accordingly, within 30 days of the entry of judgment in this case, Plaintiff shall file a motion for attorney's fees pursuant to Rule 54(d) ("Rule 54 Motion"). Plaintiff's Rule 54 Motion shall state the total amount of attorney's fees that Plaintiff seeks and shall be supplemented with evidence of the reasonableness of the fees sought.

<u>CONCLUSION</u>

For the reasons stated above, Lindley's Motion (Doc. No. 54) will be DENIED, and Plaintiff's Motion (Doc. No. 51) will be GRANTED IN PART and DENIED IN PART.[37]

An appropriate corresponding order, and an appropriate corresponding judgment, will be entered.

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[37] Plaintiff's Motion is denied only as to Plaintiff request for attorney's fees. As indicated above, this denial is based not on the merits of the request, but rather on the Court's conclusion that this request must be made not via a motion for summary judgment, but rather via a motion under Rule 54(d) and this Court's Local Rule 54.01.